UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KRAUS USA, INC,

                    Plaintiff,

          v.

SERGIO MAGARIK, a/k/a SERGEI MAGARIK,
VONN, LLC, a/k/a VONN LIGHTING, LLC, d/b/a
VONN LIGHTING, LEONID VALDBERG, VIGO
INDUSTRIES, LLC and NIGEL CHALLENGER,

                    Defendants.

**OPINION AND ORDER**

17-CV-6541 (ER)

Ramos, D.J.:

          Kraus USA, Inc. ("Kraus") brings this action against former minority shareholder

Sergio Magarik ("Magarik"), Magarik's company Vonn, LLC ("Vonn"), competitor

Leonid Valdberg ("Valdberg") and his company Vigo Industries, LLC ("Vigo"), and

former employee Nigel Challenger ("Challenger"), collectively ("Defendants"), alleging,

*inter alia*, corporate espionage in usurping Kraus' opportunity to enter the lighting

business.  Before this Court is Defendants' motion for judgment on the pleadings

pursuant to Federal Rule of Civil Procedure 12(c), and Kraus' motion for leave to amend.

For the reasons set forth below, Defendants' motion is GRANTED in part and DENIED

in part, and Kraus' motion is GRANTED in part and DENIED in part.

## I.       Factual and Procedural Background

### A.       Facts Alleged in the Instant Complaint

          Kraus is a nationally known designer, manufacturer, and seller of kitchen and

bathroom plumbing fixtures.  Doc. 1, ¶ 1.  Magarik was an employee, officer, director,

and represented himself as a founding partner of Kraus until his termination on September 10, 2015. *Id.*, ¶¶ 21-22, 83.

From as early as February 2013, Kraus considered expanding its product offerings to enter the lighting market and explored several routes to gain presence in the lighting business. Docs. 1, ¶ 23; 1-1, 2. For example, Build.com, an online home improvement company, told Kraus that it could become one of its most prominent lighting suppliers (the "Lighting Opportunity"). Doc. 1, ¶¶ 25-27. To encourage Kraus to expand its business to lighting, Build.com employee Zak Kearns ("Kearns") wrote to Magarik in October 2013 that lighting was a "100M business" for Build.com, Kraus has "more brand recognition than 90% of lighting manufacturers[,]" lighting is an "easier product to get to customers[,]" "has nearly unlimited growth potential[,]" and would be "[e]asily cross-sold" with Kraus bath products. Docs. 1, ¶¶ 28-30; 1-1, 4. Kraus was also offered a joint venture with the New York Lighting Company ("NLCO"), whose focus was on commercial lighting (the "NLCO Opportunity"). Doc. 1, ¶ 33.

Magarik, who handled Kraus' relationship with Build.com, advised Kraus against both lighting opportunities, minimizing the upside and emphasizing the downside, specifically that exploiting the lighting opportunities would require a significant capital expenditure and jeopardize Kraus' growth. *Id.*, ¶¶ 34-37, 45.

Meanwhile, and without telling Kraus, Magarik bought the domain name www.vonnlighting.com on September 1, 2014, and established Vonn Lighting on February 5, 2015 to pursue the Lighting Opportunity. *Id.*, ¶¶ 48-49, 51-53. He also hired Kearns as a consultant sometime after late 2014 or early 2015, without telling Kraus that

Kearns was available for hire.  *Id.*, ¶¶ 40-45.  Kraus continued to consider the Lighting

Opportunity throughout this period.  *Id.*, ¶ 52.

According to Kraus, Magarik sought investment in Vonn from Valdberg, owner

of Vigo, a longtime competitor of Kraus in the sink and faucet market.  *Id.*, ¶¶ 58-61.

Vigo made products that Kraus believed infringed its designs.  Docs. 1, ¶¶ 62-64; 1-1, 11-

16.[1]  In exchange for Valdberg's investment in Vonn, Magarik provided Valdberg with

Kraus trade secrets, including technical product specifications, information on upcoming

designs, sales data, e-commerce data, and other commercially sensitive information

including customer lists, vendor relationships, the identity of contractual counterparties,

internal cost structure and operating expenses, and e-commerce knowledge.  Doc. 1, ¶¶

67-68, 76.  Kraus further alleges that Vigo and Valdberg knew that Magarik was usurping

its Lighting Opportunity, intended to aid and abet his misappropriation, and profit from

the Kraus trade secrets Magarik shared with them.  *Id.*, ¶¶ 69-70.  In addition, Kraus

alleges that Magarik leveraged his affiliation with Kraus to promote his new company by

contacting Kraus' account representatives at major retail outlets, noting that it "takes

significant effort" for new suppliers to gain access to those companies.  *Id.*, ¶¶ 73-75.

Despite still drawing compensation from Kraus, Magarik devoted most of his

remaining eight months at Kraus to establishing Vonn to the detriment of his Kraus-

related work.  *Id.*, ¶ 71.  He was frequently absent from work at Kraus and his

contributions to its work were increasingly limited.  *Id.*, ¶ 78.  Magarik focused on

negotiating and securing a commercial lease, hiring and onboarding Vonn employees,

and traveling to visit suppliers.  *Id.*, ¶ 79.  Valdberg and Magarik even went to China to

---

[1] At Kraus, Magarik had been tasked with protecting the company from infringement and had noted in a
June 1, 2010 email that Vigo copied Kraus' products.  Docs. 1, ¶¶ 65-66; 1-1, 18.

attend a light show during this time period, but represented that their trip was a pre-planned vacation.  *Id.*, ¶ 80.

When he was at work, Magarik created conflicts within Kraus to distract Kraus from his development of the Lighting Opportunity for himself.  *Id.*, ¶ 77.  When Kraus eventually confronted Magarik, he admitted that he launched Vonn.  *Id.*, ¶ 82.  He also acknowledged that Vigo and Valdberg infringed on Kraus' intellectual property, but asserted that they had a mutual agreement to not discuss Kraus' business.  *Id.*

Following Magarik's September 2015 termination from Kraus, several Kraus employees were recruited by Defendants.  *Id.*, ¶¶ 83, 85.  Vigo hired Daniel Racinos ("Racinos"), a longtime Kraus employee who was familiar with Kraus' product line and content strategy, and tried to recruit two other Kraus employees via LinkedIn in March 2016 and May 2017.  Docs. 1, ¶¶ 86-87; 1-1, 19-22.  Magarik also solicited and hired Challenger to work at Vonn on or about May 1, 2017.  Doc. 1, ¶ 89.

At Kraus, Challenger was subject to a confidentiality agreement that prohibited him from disclosing Kraus' confidential proprietary information.  Docs. 1, ¶¶ 91-95; 1.1 at 24-32.  On April 27, 2017, a few days prior to his resignation from Kraus, Challenger remotely logged in to Kraus' computer system and downloaded propriety information about customers, vendors, product pricing, and sales data, and then tried to delete evidence of his access history.  Docs. 1, ¶¶ 96-97; 1-1, 34.  He resigned four days later on May 1, 2017.  Doc. 1, ¶ 98.  That July, Challenger asked a current employee to send him a warranty he worked on while at Kraus over text message, and contacted another employee asking for further information about Kraus.  Docs. 1, ¶¶ 99-100; 1-1, 36.

Kraus alleges that it has suffered harm in the amount of several million dollars as a result of Defendants' actions.  Doc. 1, ¶¶ 101-02.

### B.  Magarik's Parallel State Court Case against Kraus and Co-Founders[2]

Nine days after his termination from Kraus, on September 19, 2015, Magarik filed suit in Nassau County against Kraus and fellow founders Michael Rukhlin ("Rukhlin") and Russell Levi ("Levi").  Docs. 1, ¶¶ 56-57; 112, 5; *Magarik v. Kraus USA Inc. et al.*, Index No. 606128/2015 (N.Y. Sup. Ct. Nassau Cty.) (the "Nassau County Action"). Magarik alleged that he founded Kraus in 2007 with Rukhlin and Levi, who each owned 24%, 25% and 51% of Kraus, respectively.  Petition ("Pet."), ¶¶ 9-13.  Magarik pleaded that he entered into "an oral shareholders agreement" with Rukhlin and Levi, pursuant to which he provided $100,000 cash investment and a $100,000 loan in exchange for a seat on Kraus' Board of Directors, being an employee, and having control of sales and marketing.  *Id.*, ¶¶ 14-16.

Magarik further alleged that he handled "virtually all aspects" of Kraus' business from 2007 until 2011.  *Id.*, ¶ 18.  But, in 2011, Levi relegated Magarik to sales and marketing and began dominating the business.  *Id.*, ¶¶ 20-21.  According to Magarik, Levi hired unqualified employees, diverted company resources to other ventures, manipulated the books, and took on debt.  *Id.*, ¶¶ 23, 32, 37, 58.  After Magarik refused to invest in one of the ventures, Kraus China, he was fired.  *Id.*, ¶¶ 72-76.  Magarik brought suit for, *inter alia*, dissolution of the company under N.Y. Bus. Corp. Law § 1104-a, and breach of his contract.  *Id.*, ¶¶ 80-122.  Following several years of litigation, Levi and

---

[2] "A court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) (citation omitted).  *See also Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, No. 17-CV-8987, 2020 WL 832340, at *2 n.3 (S.D.N.Y. Feb. 20, 2020) (applying *Liberty* to public records generally).

Rukhlin opted to purchase Magarik's shares under N.Y. Bus. Corp. Law § 1118(b).

Decision and Order After Trial: Findings and Conclusions ("Dec."), 2.  Magarik was

awarded $1,379,400 for his 24% share of Kraus on April 28, 2020.  *Id.*, 6.

     **C.**     **Procedural History**

Kraus filed the instant action on August 28, 2017, asserting eighteen causes of

action.  Doc. 1, ¶¶ 103-201.  Defendants filed an answer on September 19, 2017.  Doc.

21.  Magarik filed a counterclaim against Kraus and a third-party complaint against

Kraus' co-founders, among others ("Third-Party Defendants"), asserting, *inter alia*,

breach of fiduciary duty and fraud.  Doc. 29.  On January 5, 2018, Defendants moved, for

the first time, to dismiss the complaint and for judgment on the pleadings.  Doc. 54-1.

On February 9, 2018, Kraus and the Third-Party Defendants cross-moved to dismiss

Magarik's counterclaim, and the Third-Party Defendants moved to strike the third party

complaint.  Doc. 65.

On September 28, 2018, since Defendants had answered, the Court construed

Defendants' motion to dismiss as a motion for judgment on the pleadings, and denied it

as untimely, with leave to renew at the close of pleadings.  Doc. 112, 22-25.  The Court

also denied Kraus and Third-Party Defendants' cross-motion to dismiss Magarik's

counterclaim, and granted Third-Party Defendants' motion to strike Magarik's third-party

complaint.  *Id*. at 25.  On December 28, 2018, Kraus moved for judgment on the

pleadings with respect to Magarik's counterclaims and, on September 30, 2019, the Court

granted that motion.  Docs. 140, 155.

Defendants then filed a motion to dismiss the complaint pursuant to Rule 12(c) on December 27, 2018.[3]  Doc. 139.  Kraus opposed, and requested leave to amend, on February 1, 2019.  Doc. 146.  Defendants replied on February 22, 2009 and requested that the Court take judicial notice of (1) an excerpt of Levi's deposition from the Nassau County action, (2) Kraus' 2014 and 2015 operating plans, (3) Kraus' 2014 financial statement, (4) Kraus' Build.com 2015 growth and transparency plan, and (5) a discovery dispute between the parties memorialized in Defendants' October 15, 2018 letter to the Court.  Docs. 151, 152, 152-1.[4]

## II.    Legal Standards

### A.    Motion for Judgment on the Pleadings under Rule 12(c)

In evaluating a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, courts apply the same standard as applied on a motion to dismiss for failure to state a claim under Rule 12(b)(6).  *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) (describing the standards as "identical").  The facts are assumed true for purposes of deciding the pending motions and all reasonable inferences are drawn in favor of the plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  When deciding a motion for judgment on the pleadings, a court may consider the pleadings and attached exhibits, statements or documents incorporated by reference, matters subject to judicial notice, and documents

---

[3]  Defendants re-filed the same motion on October 14, 2019 due to an ECF filing error.  Doc. 160.

[4]  Though the Court may take judicial notice of the existence of the October 15, 2018 letter, which was publicly filed, the Court declines to take judicial notice of any of the other documents cited by Defendants. *See supra* 5 n.2; Doc. 151, 1-11; *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559-60 (2d Cir. 2016) (reversing lower court decision to consider plaintiff's deposition testimony in state court action when deciding motion to dismiss because not "integral" to the complaint); *U.S. v. $22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 252 n.45 (2010) (declining to address the "evidentiary items" claimants wanted judicially noticed because they raised questions of fact not resolvable on summary judgment or motion to dismiss).

submitted by the moving party that the non-moving party either has in its possession or

relied on in the pleadings.  *Prentice v. Apfel*, 11 F. Supp. 2d 420, 424 (S.D.N.Y. 1998)

(citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

### B.      Motion to Amend under Rule 15(a)

Rule 15 of the Federal Rules of Civil Procedure allows a party to amend its

complaint pursuant to the other party's written consent or the court's leave.  Fed. R. Civ.

P. 15.  Under Section 15(a)(2), a "court should freely give leave [to amend] when justice

so requires."  Fed. R. Civ. P. 15(a)(2).  Motions to amend are ultimately within the

discretion of the district court judge, *Foman v. Davis*, 371 U.S. 178, 182 (1962),

who may deny leave to amend for "'good reason, including futility, bad faith, undue

delay, or undue prejudice to the opposing party.'"  *Holmes v. Grubman*, 568 F.3d 329,

334 (2d Cir. 2009) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d

Cir. 2007)).

An amendment to a pleading is futile if the proposed claim would not withstand a

motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Dougherty v. North Hempstead*

*Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (citing *Ricciuti v. N.Y.C. Transit*

*Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).  The Second Circuit has held that leave to

amend may be denied on the basis of futility when it is "beyond doubt that the plaintiff

can prove no set of facts in support of his amended claims."  *Pangburn v. Culbertson*,

200 F.3d 65, 70-71 (2d Cir. 1999) (citation omitted).  In determining whether an

amendment is futile, the court evaluates the amended complaint "through the prism of a

Rule 12(b)(6) analysis."  *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423,

433 (S.D.N.Y. 2006).  Following this standard, the court accepts the Plaintiff's factual

allegations as true and draws reasonable inferences in favor of the Plaintiff.  *Id.*

### III.   Discussion

   **A.   Alleged Violation of the Defend Trade Secrets Act and Misappropriation of Trade Secrets against All Defendants  (Counts I and IX)**

   Effective on May 11, 2016, the Defend Trade Secrets Act, or DTSA, created a

private right of action for the misappropriation of trade secrets in federal court.  18

U.S.C. § 1836(b); *Kairam v. West Side GI, LLC*, 793 F. App'x 23, 27 (2d Cir. 2019)

(summary order); *Zirvi v. Flatley*, No. 18-CV-7003, 2020 WL 208820, at *9 (S.D.N.Y.

Jan. 14, 2020).  Under the DTSA, "a party must show an unconsented disclosure or use of

a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time

of disclosure, knew or had reason to know that the trade secret was acquired through

improper means, under circumstances giving rise to a duty to maintain the secrecy of the

trade secret, or derived from or through a person who owed such a duty." *Medidata*

*Solutions, Inc. v. Veeva Sys. Inc.*, No. 17-CV-589, 2018 WL 6173349, at *4 (S.D.N.Y.

Nov. 26, 2018) (citations omitted).  Improper means includes "inducement of a breach of

duty to maintain secrecy[,]" like a contractual agreement not to disclose information.  *Id.*

(citations omitted).

   The DTSA defines trade secrets as "all forms and types of financial, business,

scientific, technical, economic, or engineering information, including patterns, plans,

compilations, program devices, formulas, designs, prototypes, methods, techniques,

processes, procedures, programs, or codes[.]"  18 U.S.C. § 1839(3).  However, to qualify

as a trade secret, the owner of the trade secret must have taken "reasonable measures" to

keep it a secret and the trade secret itself must acquire economic value from not being generally known or easily obtained by others who would gain economic value from the use or disclosure of it.  *Id.*  Though the Second Circuit has not articulated a specificity requirement for pleading a trade secret, and it is "not necessary to disclose every detail of an alleged trade secret in a complaint[,]" the district courts routinely require that the allegations must "specify the general contours of a trade secret" without merely restating the elements of one.  *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 448 (S.D.N.Y. 2019) (citations omitted); *Lawrence v. NYC Med. Practice*, *P.C.*, No. 18-CV-8649, 2019 WL 4194576, at *4 (S.D.N.Y.  Sept. 3, 2019) (citation omitted); *Medidata Solutions, Inc.*, 2018 WL 6173349, at *3.

Though the question of whether proprietary information qualifies as a trade secret is ordinarily a question of fact not resolvable on a motion to dismiss, courts dismiss claims involving trade secrets where they are not actually secret or there is no discernible economic value from them not being generally known.  *Zirvi*, 2020 WL 208820, at *11; *ExpertConnect, L.L.C. v. Fowler*, No.18-CV-4828, 2019 WL 3004161, at *5 (S.D.N.Y. July 10, 2019).  Courts consider several factors as "guideposts[,]" which need not all be alleged, in discerning whether information qualifies as a trade secret, including

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Iacovacci v. Brevet Holdings, LLC*, No. 18-CV-8048, 2020 WL 528059, at *8 (S.D.N.Y. Feb. 3, 2020) (citation omitted).

The elements for stating a claim of misappropriation of trade secrets under New York law "are fundamentally the same" as those sustaining a claim under the DTSA. *Id.* at *7 (citing *N. Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999)). If a complaint sufficiently alleges a claim under the DTSA, it also sufficiently pleads misappropriation of trade secrets under New York law. *Id.* (citation omitted).

Defendants argue preliminarily that Kraus's claim under the DTSA fails because Kraus has not sufficiently pleaded a protectable trade secret. Doc. 161, 5-9. Defendants also describe Kraus' description of the trade secrets at issue as conclusory and contend that such claims render making a defense difficult. Doc. 161, 6-8. But, Kraus alleges several specific categories of information that were misappropriated, including technical product specifications, information on upcoming designs, sales data, e-commerce data, and other commercially sensitive information including customer lists, vendor relationships, the identity of contractual counterparties, internal cost structure and operating expenses, and e-commerce knowledge. Doc. 1, ¶¶ 67-68, 76. At the pleading stage, alleging categories of trade secrets are sufficiently specific to support a claim under DTSA and provide sufficient notice to the defendant. *Medidata Solutions*, 2018 WL 6173349, at *3 (finding pleading "numerous specific categories of information relating to its software, marketing and business plans" sufficiently specific to survive a motion to dismiss and to provide defendant with notice of the claims against them); *iSentium, LLC v. Bloomberg Fin. L.P.*, No. 17-CV-7601, 2018 WL 6025864, at *3 (S.D.N.Y. Nov. 16, 2018).[5]

---

[5] Defendants further argue that Kraus fails to identify any specific intellectual property that Defendants misappropriated, but Kraus need only identify "the general contours" of the trade secrets to plead a viable claim of misappropriation. *Democratic Nat'l Comm.*, 392 F. Supp. 3d at 447-48. Doc. 161, 8.

Turning to the specific categories of trade secrets alleged to have been misappropriated, Defendants contend that Kraus' customer lists cannot be trade secrets because its customers are well-known retailers like Home Depot and Lowe's, which is discoverable with minimal effort and provides no competitive advantage to Kraus.  Doc. 161, 5.  Defendants further argue that price lists are not trade secrets for the same reasons, and because Kraus does not claim a propriety formula underlying its prices.  *Id.*, 6-7.  Defendants are wrong.  Kraus pleaded that its vendor relationships required "significant effort" to develop.  Docs. 1, ¶¶ 68, 73-74; 146, 4-5.  Kraus also contends that Magarik used the customer list to further his lighting business by building on Kraus' longstanding relationships with these retailers.  Docs. 1, ¶¶ 68, 72-75; 146, 5-6.[6] Moreover, Kraus alleges that with its pricing information and customer lists, competitors Vigo and Valdberg could undermine its market share, offering similar products for lower prices to the same account representatives.  Docs. 1, ¶¶ 67-70; 146, 6.  In *ExpertConnect, L.L.C. v. Fowler*, the Southern District of New York upheld similar claims that customer lists and pricing information were trade secrets because they allowed defendant to underprice plaintiff's product and divert customers.  2019 WL 3004161, at *3-5.  *See also Telerete Sys., Inc. v. Caro*, 689 F. Supp. 221, 232 (S.D.N.Y. 1988) (granting preliminary injunction for misappropriation of a trade secret under state law pre-DTSA because, "[e]ven a slight competitive edge will satisfy this requirement of trade secret protection.").

Indeed, many of the cases cited by Defendants support the proposition that customer lists and pricing information have traditionally been considered trade secrets.

---

[6] Defendants' contention that Kraus does not allege how Magarik could have used this information to further Vonn's success in the lighting business given that Kraus does not sell lighting is thus unavailing. Doc. 161, 8.

*See, e.g.*, *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) ("Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law."); *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 498 (S.D.N.Y. 2002) (identifying customer lists as trade secrets); *Hudson Hotels v. Choice Hotels Int'l*, 995 F.2d 1173, 1176-77 (2d Cir. 1993), *abrogated on other grounds*, *Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 379 n.9 (2d Cir. 2000) ("Compilations of information, traditionally viewed and protected under trade secret law, are items like customer and supplier lists and pricing and cost information.").[7]  This is especially true where, as here, the compilation of the customer lists is alleged to have taken considerable experience and effort.  *N. Atlantic Instruments*, 188 F.3d at 44-46; *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 395 (1972).

Defendants further argue that Kraus did not allege how it sought to protect its trade secrets and that the customer lists and pricing information were not actually secrets because they are readily available to the public.  Doc. 161, 6-7, 10.  Yet, Kraus alleged that Challenger signed a confidentiality agreement prohibiting him from sharing trade secrets such as customer information and pricing policies.  Docs. 1, ¶¶ 6-7, 90-95, 105; 1-1, 24; 146, 7-8.  In addition, as Defendants admit, this information was maintained in Kraus' computer system and was protected, as it was only available to Challenger with a username and password.  Doc. 161, 9.  This is sufficient to establish Kraus' efforts to maintain secrecy.  *See TransPerfect Global, Inc. v. Lionbridge Tech., Inc.*, No. 19-CV-

---

[7] The cases Defendants cite to the contrary were not in the motion to dismiss context, and were often for injunctive relief, requiring a showing of the likelihood of success on the merits, a more rigorous standard than plausibility.  *See, e.g.*, *Prod. Res. Group, LLC v. Oberman*, No. 03-CV-5366, 2003 WL 22350939, at *14 (S.D.N.Y. Aug. 27, 2003) (denying TRO because "The testimony makes clear that customer contacts are not protectable trade secrets in this case."); *Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 566-67 (S.D.N.Y. 2016) (finding, in a pre-DTSA case where plaintiff sought a TRO, customer lists and pricing information were not trade secrets because they were readily ascertainable customers, and there was no pricing algorithm).

3283, 2020 WL 1322872, at *4-5 (S.D.N.Y. Mar. 20, 2020) (noting that a plaintiff has made reasonable efforts to secure trade secrets where there is a confidentiality agreement limiting their disclosure and they can only be accessed via proprietary login); *Medidata Solutions*, 2018 WL 6173349, at *3.  In addition, Kraus alleged it derived value from keeping this information a secret, lending further plausibility to its misappropriation claims.  Docs. 1, ¶¶ 68, 74; 146, 6; *TransPerfect Global*, 2020 WL 1322872, at *4 (alleging value of information in prevention of underbidding by competitors).

　　　　Nor is it a defense to say that a trade secret is readily available if the information was actually obtained via a confidential relationship.  Docs. 161, 8; 146, 5.  This Court has long held that, "[e]ven assuming that the information could be obtainable through reverse engineering without a base of prior knowledge gleaned from the proprietary materials, . . . the *possibility* of discovery by fair and honest methods does not preclude the finding of a trade secret."  *Anacomp, Inc. v. Shell Knob Servs., Inc.*, No. 93-4003, 1994 WL 9681, at *12 (S.D.N.Y. Jan. 10, 1994), *aff'd*, 29 F.3d 621 (2d Cir. 1994) (affirming grant of preliminary injunction) (citation omitted and emphasis in original).[8]

　　　　While Defendants argue that Kraus does not allege the improper means by which Challenger obtained trade secrets given that he had login credentials, Challenger is alleged to have downloaded sensitive information that he was prohibited from sharing mere days before his resignation, tried to delete evidence that he had logged into the system, and shared that information with the other Defendants to their benefit and to Kraus' detriment.  Docs. 1, ¶¶ 6-9, 67-70, 89-100; 1-1, 24-32; 161, 9.  Allegations that an employee personally downloaded information from a proprietary system covered by a

---

[8]  That the warranty Challenger sought from his former Kraus colleague was available online is of no moment, as Kraus does not allege that the terms of the warranty were a trade secret.  Doc. 161, 8.

confidentiality agreement are sufficient to sustain a claim under the DTSA.  *AUA Private Equity Partners, LLC v. Soto*, No. 17-CV-8035, 2018 WL 1684339, at *4-5 (S.D.N.Y. Apr. 5, 2018); *Medidata Solutions*, 2018 WL 6173349, at *4.

Defendants also argue that Kraus has failed to allege that the DTSA violation relates to interstate commerce.  Doc. 161, 9.  However, Kraus alleges that it is a "nationally renowned" company and its trade secrets are used in interstate commerce, which are sufficient to state a claim under the DTSA.  Docs. 1, ¶¶ 1, 104; 146, 7.   In *Yager v. Vignieri*, this Court concluded that allegations that a doctor's patients came from across state lines was a sufficient nexus for interstate commerce.  No. 16-CV-9367, 2017 WL 4574487, at *2 (S.D.N.Y. Oct. 12, 2017) (acknowledging that the DTSA was meant to "'reach broadly in protecting against the theft of trade secrets.'") (citation omitted).

Accordingly, Defendants' motion for judgment on the pleadings is denied as to Counts I and IX.[9]

### B.    Alleged Violation of the Computer Fraud and Abuse Act against All Defendants (Count II)

The Computer Fraud and Abuse Act ("CFAA") created a civil right of action for any person who suffered "damages or loss" as a result of individuals who intentionally accessed a protected computer without authorization or in a way that exceeded their authorized access.  18 U.S.C. §§ 1030(a)(2)(C), 1030(g).  Under the CFAA, damage refers to "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. §§ 1030(e)(8).  Loss is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment,

---

[9] Because Kraus' federal claim under the DTSA survives Defendants' motion for judgment on the pleadings, the Court need not decide whether Kraus' remaining claims afford the Court subject matter jurisdiction in this case. Doc. 161, 44.

and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. §§ 1030(e)(11).  Any alleged loss is limited to "economic damages" of at least $5,000.  18 U.S.C. §§ 1030(c)(4)(A)(i)(I), 1030(g).  This Court has long held that "costs not related to computer impairment or computer damages are not compensable under the CFAA."  *Civic Center Motors, Ltd. v. Mason Street Import Cars, Ltd.*, 387 F. Supp. 2d 378, 382 (S.D.N.Y. 2005); *see also Deutsch v. Human Res. Mgmt., Inc.*, No. 19-CV-5305, 2020 WL 1877671, at *5 (S.D.N.Y. Apr. 15, 2020).

Defendants are correct that Kraus failed to adequately plead damages or loss. Doc. 161, 11-13.  Unlike cases Kraus cites to the contrary, Kraus did not allege that it conducted any investigation related to Challenger's accessing of their computer system or suffered any damage to its computer system from his access.  *See, e.g.*, *Obeid on behalf of Gemini Real Estate Advisors LLC v. La Mack*, No. 14-6498, 2017 WL 1215753, at *8 (S.D.N.Y. Mar. 31, 2017) (denying motion to dismiss CFAA counterclaim because defendant alleged plaintiff's damage to servers and costs to repair in excess of the $5,000 threshold); *Lapp Insulators LLC v. Gemignani*, No. 09-0694, 2011 WL 1198648, at *7 (W.D.N.Y. Mar. 9, 2011) (denying dismissal motion because plaintiff alleged an investigation following unauthorized access of computer system).  Kraus alleges only that "[a]s a result [of Challenger's access] Defendants have obtained items of value and have caused harm in excess of $5,000."  Doc. 1, ¶ 113.  This allegation implies that Kraus seeks damages that are not countenanced by the CFAA.  *Civic Center Motors*, 387 F. Supp. 2d at 382.  Even if the "harm" referenced were interpreted as harm to Kraus'

16

computer system, which is nowhere else alleged, the allegation would still fail as conclusory. *Deutsch*, 2020 WL 1877671, at *5 ("Because Plaintiff alleges only that she incurred more than $5,000 in damages, she has not adequately alleged that she satisfied the CFAA threshold").

Because Kraus' CFAA claim fails on these grounds, it is unnecessary to address Defendants' other arguments for dismissal.[10]  Doc. 161, 13-16.  Accordingly, Defendants' motion for judgment on the pleadings is granted as to Count II and Kraus' claim under the CFAA is dismissed.[11]

### C.    Breach of Fiduciary Duty (Counts III and XVII) and Request for Declaratory Judgment (Count VII)

In New York, "an employee owes a duty of good faith and loyalty to his employer."  *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 659 (S.D.N.Y. 2005) (citing *Western Elec. Co. v. Brenner*, 41 N.Y.2d 291, 295 (1977) and *Mar. Fish Prods. v. World-Wide Fish Prods.*, 100 A.D.2d 81, 87 (1st Dep't 1984)); *Laro Maint. Corp. v.*

---

[10]  It bears noting, however, that Kraus also failed to state a claim under the CFAA because Challenger was admittedly an employee with access to the materials he is alleged to have circulated. Docs. 1, ¶¶ 7, 96-98; 148, 9-10; 161, 13-15.  In *U.S. v. Valle*, the Second Circuit held that defendant, who had access to a law enforcement database for his work as a police officer, but who had accessed information from that database for a purpose unrelated to law enforcement, had not exceeded his authorized access under the CFAA.  807 F.3d 508, 523-24, 527-28 (2d Cir. 2015).  In an even more similar case, *Amphenol Corp. v. Paul*, the Second Circuit found that a former employee who had downloaded proprietary information before his termination had not exceeded his authorized access because his former employer failed to allege that the material he accessed was outside of the scope of his authorization.  591 F. App'x 34, 36 (2d Cir. 2015) (summary order).  *See also Deutsch*, 2020 WL 1877671, at *3 (dismissing a CFAA claim because "[t]he law is clear in the Second Circuit that the CFAA imposes liability only on persons who gain access to a protected system when that access was not authorized.");  *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 232 (S.D.N.Y. 2013) ("exploitative or disloyal access to an employer's computer will not render otherwise permissible access unauthorized within the CFAA's meaning.").  The Court notes, however, that the Supreme Court granted certiorari on the question of whether a person who is authorized to access information on a computer for certain purposes violates § 1030(a)(2) of the CFAA by accessing the same information for an improper purpose.  *Van Buren v. U.S.*, 940 F.3d 1192, 1207-08 (11th Cir. 2019) (affirming conviction under CFAA for misusing computer access), *cert. granted*, --- S. Ct. ---, 2020 WL 1906566 (U.S. Apr. 20, 2020) (No. 19-783).

[11]  Because Kraus' CFAA claim fails, the Court need not address whether there would be personal liability for Magarik and Valdberg under the statute.  Doc. 161, 15-16.

*Culkin*, 267 A.D.2d 431, 433 (2d Dep't 1999) (applying the same rule to officers as well

as employees).  An employee also has "'an affirmative duty at all times to act in his

employer's best interests.'"  *Design Strategies, Inc.*, 384 F. Supp. 2d at 659 (quoting

*Mar. Fish Prods., Inc.*, 100 A.D.2d at 89).  "Disloyal employees may be held liable for

their compensation even if 'the principal suffered no provable damage as a result of the

breach of fidelity.'"  *Design Strategies, Inc.*, 384 F. Supp. 2d at 660 (citation omitted).

### i.      Magarik

Under New York Law, officers and directors of a corporation must perform their

duties "in good faith and with that degree of care which an ordinarily prudent person in a

like position would use under similar circumstances."  N.Y. Bus. Corp. Law §§ 715(h),

717(a).  Pursuant to these provisions, officers and directors owe a fiduciary duty to the

corporation and its shareholders.  *In re Global Serv. Group, LLC*, 316 B.R. 451, 459

(S.D.N.Y. 2004).  Though a fiduciary is allowed to pursue other business ventures

without the consent of his colleagues, "[i]t is axiomatic that a corporate fiduciary may not

divert and exploit any opportunity that belongs to the corporation."  *Memory Film Prods.*

*v. Makara*, No. 05-CV-3735, 2008 WL 11434484, at *5 (E.D.N.Y. Sept. 5, 2008) (citing

*Am. Fed. Group, Ltd. v. Rothenberg*, 136 F.3d 897, 905-06 (2d Cir. 1998)).  This concept,

known as the corporate opportunity doctrine, prohibits fiduciaries from usurping, without

consent, any opportunity that should be deemed an asset of the corporation.  *Alexander &*

*Alexander of New York v. Fritzen*, 147 A.D.2d 241, 246 (1st Dep't 1989).  The doctrine is

limited, however, to circumstances where the corporation has a "tangible expectancy" in

the opportunity.  *Am. Fed. Group, Ltd.*, 136 F.3d at 906; *Design Strategies, Inc.*, 384 F.

Supp. 2d at 672.  A tangible expectancy in the opportunity is "something much less

tenable than ownership, but, on the other hand, more certain than a desire or a hope."

*Am. Fed. Group, Ltd.*, 136 F.3d at 906 (citing *Alexander & Alexander of New York, Inc.*,

147 A.D.2d at 247-48).  Where the plaintiff seeks damages for a breach of fiduciary duty,

they must allege that defendant's breach proximately caused their injury.  *In re Refco Sec.*

*Litig.*, 826 F. Supp. 2d 478, 514 (S.D.N.Y. 2011).  Pleading proximate cause means

alleging plaintiff's injury was the "direct or reasonably foreseeable result" of defendant's

actions.  *Id.* (citation omitted).

Defendants argue that the complaint fails to state a claim that Magarik breached

his fiduciary duty to Kraus because the complaint contains no factual detail as to how he

proximately caused its damages.  Doc. 161, 16.  Defendants further contend that Magarik

starting Vonn while he was still employed by and a minority shareholder of Kraus is not a

breach of his fiduciary duty because even a fiduciary can engage in other opportunities

outside of the corporation.  *Id.*, 16-17.  However, Kraus' description of Magarik's actions

clearly state a claim that he diverted an opportunity Kraus was considering and had at

least a tangible expectancy of obtaining, without its consent.  *Am. Fed. Group, Ltd.*, 136

F.3d at 906.  Kraus pleads with sufficient detail that, while Magarik was an officer and

director of Kraus, he handled Kraus' relationship with Build.com and he advised Kraus

against exploiting the Lighting Opportunity and the NLCO Opportunity because of their

cost and diversion of resources from Kraus' main product line.  Doc. 1, ¶¶ 29, 34-38.

Kraus also alleges that Magarik started Vonn and used its contacts with retailers to take

advantage of the Lighting Opportunity.  Doc. 1, ¶¶ 49, 51, 71-75.  Kraus additionally

alleges that it was still considering the Lighting Opportunity and the NLCO Opportunity

when Magarik formed Vonn, and that Magarik never asked for its consent to pursue the

Lighting Opportunity for his own benefit.[12]  Doc. 1, ¶¶ 52-55.  Moreover, these

allegations support the inference that Magarik's breach was the proximate cause of

Kraus' injuries.  Doc. 1, ¶¶ 101-02; *In re Refco Sec. Litig.*, 826 F. Supp. 2d at 515

("Questions of proximate cause are generally left to the jury.").

Defendants' reliance on *Licensing Dev. Group, Inc. v. Freedman*, 184 A.D.2d 682

(2d Dep't 1992) and *Alexander & Alexander of New York, Inc. v. Fritzen*, 147 A.D.2d

241 (1st Dep't 1989) is misplaced.  Docs. 151, 13-14; 161, 17-20.  In *Licensing Dev.*

*Group*, Freedman started his own licensing company, which had a lucrative deal with the

brand Teenage Mutant Ninja Turtles, before entering into a separate licensing venture

with other partners.  184 A.D.2d at 682.  His partners in the second licensing company

then brought suit for his failure to disclose the Ninja Turtles relationship.  *Id.* at 683.

While affirming dismissal of plaintiffs' breach of fiduciary duty claim, the Second

Department reasoned that Freedman could not have usurped the second company's

corporate opportunity because he had secured the Ninja Turtles deal long before the

second company existed.  *Id.*  Not so here:  Magarik started Vonn only after the two

lighting opportunities were presented to Kraus and while Kraus was still considering

them.  Docs. 1, ¶¶ 29-33, 49-55; 146, 14.  In *Alexander & Alexander*, the First

Department affirmed summary judgment that defendants had not diverted a corporate

---

[12]  Defendants additionally contend that Magarik did not usurp the Lighting Opportunity from Kraus
because (1) Kraus is not in the lighting business today;  (2) there is nothing proprietary from Kraus'
business that would have been useful to Vonn;  (3) the entire lighting market does not count as an
opportunity; and (4) Vonn did not exist at the time of the presentation of the Lighting Opportunity.  Doc.
151, 11-13.  None of these arguments have merit.  Kraus alleges precisely that its relationships, which took
resources to develop, were leveraged by Magarik to establish Vonn in the lighting business, and that Kraus
had opportunities to enter that business but did not do so because of Magarik's self-serving advice.  Doc. 1,
¶¶ 32-38, 73-75.  Contrary to Defendants assertions, entry into the lighting business was not just a
"natural[] or easy[]" expansion for Kraus; it had two tangible opportunities to do so that it did not take
based on Magarik's representations.  *Alexander & Alexander*, 147 A.D.2d at 249; Docs. 151, 13-14; 161,
18.

opportunity to sell insurance in part because plaintiff could not sell insurance in New

York and did not know of plaintiff's desire to sell insurance there.  147 A.D.2d at 248-49.

Here, Kraus could have sold lighting and was presented with at least two opportunities to

do so, which Magarik knew.  Docs. 1, ¶¶ 31-39; 146, 13-14.

Thus, Defendants' motion for judgment on the pleadings as to Counts III and

VII[13] is denied.

### ii.    Challenger

Defendants argue that Challenger did not breach his fiduciary duty because he

accessed Kraus' computer system using his active username and password while still an

employee.  Doc. 161, 43.  However, Kraus' claim is not entirely predicated on its CFAA

claim.  Docs. 1, ¶ 192; 146, 36-37; *see supra* Part III.B.  Kraus' claim is based on

allegations that Challenger downloaded proprietary information to share with Magarik

and Vonn, who usurped Kraus' Lighting Opportunity, and Valdberg and Vigo, who

compete with and copy Kraus products, to aid all of them in profiting at the expense of

Kraus' business.  Docs. 1, ¶¶ 7-8, 89-100; 146, 36-37.  Kraus has thus sufficiently alleged

that Challenger, who was a Kraus employee at the time of these actions, violated his duty

to be loyal to Kraus and to act in Kraus' best interests.

Defendants further argue that because Kraus failed to show sufficient damages to

its computer system under the CFAA, Kraus cannot show any damage resulting from any

breach of Challenger's fiduciary duty.  Doc. 161, 43.  While the Court agrees that Kraus

---

[13] Defendants contend that Kraus is not entitled to declaratory judgment that Magarik, Vonn, and Valdberg usurped Kraus' corporate opportunity and in support of a corporate trust if the fiduciary duty claim fails. Doc. 161, 20-21.  Because this claim survives Defendants' motion, and because the remedy for a diversion of corporate opportunity is a constructive trust, Defendants' motion for judgment on the pleadings as to Kraus' request for a declaratory judgment, Count VII, is also denied.  Docs. 1, ¶¶ 128-30, 136-39; 146, 12; 161, 17, 20-21.  *Cont'l Indus. Grp., Inc. v. Altunkilic*, 788 F. App'x 37, 43 (2d Cir. 2019) (summary order).

has not alleged sufficient damages under the CFAA, *see supra* Part III.B, Kraus need not

show damages to sustain a claim of breach of fiduciary duty. *Design Strategies, Inc.*, 384

F. Supp. 2d at 660 (citation omitted).

Thus, Defendants' motion for judgment on the pleadings as to Count XVII is

denied.

### D.    Magarik's Alleged Conversion and Theft (Count IV)

Conversion occurs when "someone, intentionally and without authority, assumes

or exercises control over personal property belonging to someone else, interfering with

that person's right of possession." *Colavito v. New York Organ Donor Network, Inc.*, 8

N.Y.3d 43, 49-50 (2006) (citation omitted).  To allege a claim of conversion, a plaintiff

must plead that defendant's dominion over, or interference with, its possessory right over

property derogated those rights. *Petrone v. Davidoff Hutcher & Citron, LLP*, 150 A.D.3d

776, 777 (2d Dep't 2017) (citing *Colavito*, 8 N.Y.3d at 50).

Defendants argue that because trade secrets are intangible, Kraus' conversion

claim must fail.  Doc. 161, 28-29.  In making this argument, Defendants rely on too

narrow an interpretation of *Thyroff v. Nationwide Mutual Ins. Co.*, 8 N.Y.3d 283 (N.Y.

2007).  In *Thyroff*, the New York Court of Appeals addressed a certified question from

the Second Circuit on whether electronic records stored on a computer constituted

tangible property.  8 N.Y.3d 283, 284 (2007).  The Court of Appeals explained that,

though conversion historically only applied to physical property, "electronic records that

were stored on a computer and were indistinguishable from printed documents" are also

subject to conversion claims.  *Id.* at 288-93.  Although the Court of Appeals declined to

decide "whether any of the myriad other forms of virtual information should be protected

by the tort[,]" the electronic records it determined were subject to conversion—customer contacts and related data—are remarkably similar to those at issue here. *Id.* at 292-93.

More than a decade later, in *People v. Aleynikov*, the Court of Appeals rejected the argument that even a copy of computer source code was intangible. 31 N.Y.3d 383, 401-02 (N.Y. 2018). Aleynikov had downloaded high frequency trading source code from Goldman Sachs before resigning to work for a start-up that aimed to create similar source code. *Id.* at 386-88. As a defense to N.Y. Penal Law § 165.07, which prohibits making tangible reproductions of scientific material, he argued that *Thyroff* implied that electronic records are intangible. *Id.* at 401. The Court of Appeals rejected this argument, reasoning that *Thyroff* "is best read . . . as treating the allegedly converted *information* as intangible property, rather than as holding or implying that any electronic reproduction of the information stored on a computer was intangible." *Id.* at 402 (emphasis in original). Because the trade secrets Kraus alleges Magarik converted— technical product specifications, information on upcoming designs, sales data, e-commerce know-how and data, customer lists, vendor relationships, the identity of contractual counterparties, and internal cost structure and operating expenses—were stored on the computer but likely shared in some tangible, documentary form, a conversion claim is sufficiently alleged. Docs. 1, ¶¶ 67-68, 96; 146, 22; *Thyroff*, 8 N.Y.3d at 292-93; *see also Salonclick LLC v. SuperEgo Mgmt. LLC*, No. 16-CV-2555, 2017 WL 239379, at *4-5 (S.D.N.Y. Jan. 18, 2017) (denying dismissal of conversion claim based on intangible domain and social media account names).[14]

---

[14] To the extent Defendants are also arguing that the appropriation of the Lighting Opportunity is not properly the subject of a conversion claim based on *Barrett v. Toroyan*, 28 A.D.3d 331 (1st Dep't 2006), Kraus' still plausibly pleads conversion. Doc. 161, 28-29. The *Barrett* Court dismissed a conversion cause of action with respect to a partnership opportunity, but sustained as to asset management fees. *Id.* at 333.

Defendants also argue that this Court should dismiss Kraus' conversion claim because it is duplicative of Kraus' misappropriation of trade secrets claim. Doc. 161, 29. However, alternative pleading is expressly authorized by Rule 8(d)(2) of the Federal Rules of Civil Procedure. *Paysys Int'l v. Atos SE*, No. 14-CV-10105, 2015 WL 4533141, at *4 (S.D.N.Y. July 24, 2015) (declining to dismiss conversion claim as duplicative of tort and contract claims based on Rule 8(d)(2)).

Accordingly, Defendants' motion for judgment on the pleadings as to Count IV is denied.

### E.    Alleged Unjust Enrichment Against All Defendants (Count XV)

Adequately pleading unjust enrichment requires alleging that the defendant was enriched at the plaintiff's expense, and that allowing the defendant to retain what plaintiff seeks to recover runs contrary to "equity and good conscience." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (N.Y. 2012) (citation omitted). Because unjust enrichment is a "quasi-contract" claim, it also requires that there be a relationship between the parties that is not "too attenuated." *Id.* (citing *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215-16 (N.Y. 2007)).

Defendants argue that there are "[z]ero allegations" to support an unjust enrichment claim against Vigo and Valdberg and that, as competitors and not fiduciaries, their relationship with Kraus is too attenuated for relief. Docs. 151, 15-16; 161, 25. Defendants are wrong. In the case Defendants' primarily rely on, *Georgia Malone & Co. v. Rieder*, Georgia Malone did due diligence on properties for a developer, CenterRock, but CenterRock shared the due diligence with a rival company, Rosewood, who advised a

---

Similarly, Kraus' conversion allegations, read broadly, encompass Magarik's profits from usurping the Lighting Opportunity. Doc. 1, ¶¶ 101-02, 124-27.

new buyer to purchase the properties, cutting Georgia Malone out of its promised commission.  19 N.Y.3d at 513-14.  The New York Court of Appeals affirmed dismissal of Georgia Malone's unjust enrichment claim against Rosewood, concluding that their relationship was too attenuated, as they had no interactions and there were no allegations that Rosewood was even aware of the "wrongfulness" of the other parties' actions.  *Id.* at 517-19.  Unlike in *Georgia Malone*, Kraus alleged that Vigo and Valdberg were aware of Magarik's deceits.  Docs. 1, ¶¶ 58-70; 146, 19.

As a result, this case is more like *Philips Int'l Inv., LLC v. Pektor*, 117 A.D.3d 1 (1st Dep't 2014).  In *Philips*, plaintiff entered a venture to buy properties with the Pektors, which they ultimately did not buy, but which the Pektors bought through numerous entities they created to shut plaintiff out of the transaction.  *Id.* at 3-4.  The First Department affirmed plaintiff's pleading of unjust enrichment against all of the entities because those entities were working with the Pektors and thus not too attenuated from plaintiff.  *Id.* at 7-8.  Like the Pektors in *Philips*, Magarik is the common denominator sufficiently connecting Kraus to Vigo and Valdberg.  Here, Kraus alleged that Vigo and Valdberg were aware of Kraus as a major competitor, and invested in Vonn, Magarik's company, in exchange for confidential information about Kraus' business.[15]  Docs. 1, ¶¶ 3, 58-70, 101; 146, 19.

Defendants also argue that the claim must fail because Magarik owed no fiduciary duty to Kraus, and Valdberg and Vigo therefore did not aid and abet his breach of that duty.  Doc. 161, 25.  As noted, the Court disagrees.  *See supra* Part III.C.i; *infra* Part III.H.  But, more fundamentally, Magarik was an officer and director of Kraus during the

---

[15] For the same reasons, Defendants' argument that Kraus, Vigo and Valdberg do not have a sufficiently close relationship for an unjust enrichment claim because they are competitors fails.  Doc. 151, 15-16.

relevant time period, hardly an attenuated relationship.  Docs. 1, ¶ 21; 146, 18-19.

Because Challenger was also an employee of Kraus during the relevant time period,

Defendants' argument to exclude him from the unjust enrichment claim likewise fails.

Docs. 1, ¶¶ 89-98; 146, 19; 161, 27.

Thus, Defendants' motion for judgment on the pleadings as to Count XV is

denied.

### F.       Request for a Constructive Trust against Vonn (Count V)

Courts in this jurisdiction have long held that "'a constructive trust is the formula

through which the conscience of equity finds expression.'"  *Counihan v. Allstate Ins. Co.*,

194 F.3d 357, 360 (2d Cir. 1999) (quoting *Simonds v, Simonds*, 45 N.Y.2d 233, 241

(1978)).  Pleading the necessity of a constructive trust is flexible and relies on several

factors:  (1) a confidential or fiduciary relationship; (2) a promise; (3) a transfer in

reliance on that promise; and (4) unjust enrichment.  *Counihan*, 194 F.3d at 361-62

(citations omitted).

Defendants argue that Kraus' request for a constructive trust must fail because

Kraus has not successfully pleaded unjust enrichment.  Doc. 161, 28.  However, as stated

*supra* Part III.E, Kraus has plausibly pleaded unjust enrichment.  Defendants further

argue that Kraus has failed to allege a promise or a transfer of tangible property.  Doc.

161, 28.  But, as explained *supra* Parts III.D and III.C.i., the trade secrets were tangible,

and Kraus has sufficiently pleaded that Magarik had a fiduciary duty to Kraus to act in

good faith, which he breached by transferring those trade secrets to Kraus' rival and

starting Vonn to pursue the Lighting Opportunity, all while still working for Kraus.  *See*

*also* Doc. 146, 20-21.  As a result, Defendants' motion for judgment on the pleadings as to Count V is denied.

### G.  Demand for Accounting from Magarik and Vonn (Count VI)

The right of a plaintiff to an accounting "is premised upon the existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest."  *Araujo v. Macaire*, No. 16-CV-9934, 2018 WL 894390, at *6 (S.D.N.Y. Jan. 8, 2018) (citing *Palazzo v. Palazzo*, 121 A.D.2d 261, 264 (1st Dep't 1986)).  An accounting may also be based on "the existence of a joint venture or other special circumstances warranting equitable relief" between plaintiff and defendant.  *Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, 713 F. Supp. 2d 215, 233 (S.D.N.Y. 2010) (citation omitted); *Adam v. Cutner & Rathkopf*, 238 A.D.2d 234, 242 (1st Dep't 1997)

Because Kraus has plausibly asserted a claim of breach of fiduciary duty against Magarik, Kraus' accounting claim against Magarik also survives Defendants' motion. *Araujo*, 2018 WL 894390, at *6; *supra* Part III.C.i.

In addition, the Lighting Opportunity, which Magarik usurped, constitutes property in which Kraus has an interest.  Doc. 1, ¶ 51.  Defendants counter that there is no fiduciary relationship between Kraus and Vonn.  Doc. 161, 24.  But, Kraus had a special relationship with Vonn because Magarik, an officer of Kraus, diverted Kraus' business opportunity and potential profit to Vonn.  *Sheehan v. Moore & McCormack Co.*, 219 A.D. 317, 320 (1st Dep't 1927) (ordering an accounting in part because companies had officers in common).

Moreover, because Kraus alleges Vonn was successful as a result of its industry know-how and vendor relationships, which took time and money to develop, Kraus was akin to an investor in Vonn who was cheated out of its profits.  Doc. 1, ¶¶ 72-75.  *See also Haddock v. Countrywide Bank, N.A.*, No. 14-CV-6452, 2014 WL 12597043, at *4 (C.D. Cal. Dec. 22, 2014) (evaluating a claim for accounting under a similar standard and stating, "The right to an accounting can arise from the possession by the defendant of money or property which, because of the defendant's relationship with the plaintiff, the defendant is obliged to surrender.") (citation omitted); *Kaminsky v. Kahn*, 23 A.D.2d 231, 238-39 (1st Dep't 1965) (upholding accounting claim "under the special circumstances here, where the defendant has wrongfully pocketed . . . the profits" of sale of plaintiff's stock); *cf. Intellectual Capital Partner v. Inst. Credit Partners LLC*, No. 08-CV-10580, 2009 WL 1974392, at *7 (S.D.N.Y. July 8, 2009) (citing plaintiff's exclusion of defendant from client contact list advocated against accounting claim).[16]

Thus, Defendants' judgment on the pleadings motion is denied as to Count VI.

### H.   Alleged Aiding and Abetting Magarik's Breach of Fiduciary Duty against Valdberg and Vigo (Count VIII)

Aiding and abetting a breach of fiduciary duty requires that there was a breach of fiduciary duty by another, the defendant had actual knowledge of the breach, the defendant knowingly induced or participated in the breach, and that the plaintiff suffered damages as a result of the breach.  *In re Sharp Int'l Corp.*, 403 F.3d 43, 49-50 (2d Cir. 2005) (citations omitted).  A defendant participates in a breach by providing "substantial assistance" to the primary violator, which means "affirmatively assist[ing], help[ing]

---

[16] Defendants also argue that no authority allows for a nonmember of a limited liability company to have an accounting, but cite not a single case even addressing that argument.  Doc. 151, 16; 161, 24.

conceal or fail[ing] to act when required to do so, thereby enabling the breach to occur." *Id.* at 50 (citation omitted).

Defendants argue that Kraus' claim against Valdberg and Vigo for aiding and abetting Magarik's breach of fiduciary duty must fail because the allegations are conclusory and were insufficiently detailed with respect to the actual knowledge and substantial assistance prongs. Doc. 161, 21-23. Neither argument is persuasive.

Defendants' reliance on *Kaufman v. Cohen*, 307 A.D.2d 113 (1st Dep't 2003), as support that Kraus did not plead actual knowledge is unavailing. In *Kaufman*, Kaufman, Cohen, and Seigel formed a partnership, SIG, to buy real estate and, together with another company, bought the Falchi building. *Id.* at 115. At some point, Cohen advised against maintaining SIG's share of the Falchi building, but was in secret negotiations to reacquire the building after foreclosure with new partners. *Id.* at 115-16. The First Department revived Kaufman's breach of fiduciary duty claim against Cohen on appeal, but affirmed dismissal of the aiding and abetting breach of fiduciary duty claim against the Falchi defendants because Kaufman failed to sufficiently allege their actual knowledge of Cohen's breach, stating only that the Falchi defendants were "aware of" Cohen's partnership with SIG and their interest in the Falchi building. *Id.* at 125; Doc. 161, 22. Here, by contrast, Kraus pleads in detail that Magarik had sought out Valdberg as an investor with full knowledge that Valdberg's company was a longtime competitor of Kraus. Docs. 1, ¶¶ 3-4, 58-66; 1-1, 11-16, 18. Kraus further pleads that Magarik gave Valdberg access to Kraus trade secrets in exchange for Valdberg's "substantial equity" investment in Vonn, and that Valdberg and Vigo knew Magarik was unsatisfied with Kraus and was pursuing the Lighting Opportunity without Kraus' knowledge. Doc. 1, ¶¶

58, 67-70, 76.  That Vigo was a "nemesis" of Kraus lends further credence to the inference that Valdberg and Vigo knew Magarik was vindictively sharing Kraus' trade secrets with them.  Docs.1, ¶¶  58, 69; 161, 21.  Indeed, actual knowledge may be "implied from a strong inference of fraudulent intent" and  "motive is probative of that inference."  *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d at 517 (citation omitted); Doc. 146, 16.

Kraus' allegations of substantial assistance are also adequate.  In *Am. Baptist Churches of Metropolitan New York v. Galloway*, plaintiff's aiding and abetting claim, which had been dismissed by the trial court for insufficient allegations of knowledge and substantial assistance, were reinstated on appeal.  271 A.D.2d 92, 101 (1st Dep't 2000). The First Department found the allegations were sufficient on both scores because the plaintiff had described how the primary violator and accused assisters acted in concert to divert the opportunity.  *Id.*  The First Department further reasoned that the allegations were supported by the fact that the primary violator had formed the usurping company months prior to when the deal at the center of the opportunity was meant to close.  *Id.* Like in *Am. Baptist*, the allegations here support a theory that Valdberg, Vigo, and Magarik, who created Vonn eight months prior to his departure from Kraus, acted in concert to divert Kraus' Lighting Opportunity to Vonn.  Doc. 1, ¶¶ 49, 51, 58-71, 83.

Of course, Defendants are right that Valdberg becoming Magarik's partner in Vonn does not mean that he aided and abetted Magarik's breach.  Doc. 161, 21.  But, that oversimplifies Kraus' claim, which is actually that Magarik and Valdberg had a *quid pro*

*quo* arrangement in which Valdberg provided capital for Vonn and Magarik provided Valdberg with Kraus' trade secrets.[17]  Docs. 1, ¶¶ 3-5, 58-70; 146, 16.

Accordingly, Defendants' motion for judgment on the pleadings as to Count VIII is denied.

## I.    Defendants' Alleged Tortious Interference (Count X)

To raise a claim of tortious interference, a plaintiff must show the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of the contract, defendant's "intentional procurement" of the third party's breach of the contract, actual breach of the contract, and damages as a result of the breach.  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (citation omitted).

Kraus pleads three instances of tortious interference.  First, Kraus pleads that Valdberg and Vigo tortiously interfered with Kraus' contractual relationship with Magarik.  Doc. 1, ¶ 156(a).  Second, Kraus pleads that Valdberg and Vigo tortiously interfered with Kraus' contractual relationship with Racinos.  *Id.*, ¶ 156(b).  Lastly, Kraus pleads that Magarik and Vonn tortiously interfered with Kraus' contractual relationship with Challenger.  *Id.*, ¶ 156(c).

Defendants argue that Kraus failed to state a claim that Valdberg and Vigo tortiously interfered with Kraus' contractual relationships with Magarik or Racinos because Kraus does not sufficiently allege a contractual relationship with either.  Doc. 161, 36-37, 42.[18]

---

[17] Defendants' related argument, that Valdberg and Vigo are not fiduciaries of Kraus, is equally unavailing because "a party need not have a fiduciary duty in order to be liable for aiding and abetting the breach of fiduciary duty of another."  *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d at 519; Docs. 146, 17 n.6; 151, 15; 161, 21.

[18] Defendants however, do not challenge the existence of a contract between Challenger and Kraus, or that Magarik and Vonn tortiously interfered with it.  Doc. 146, 31 n.12.

With respect to Magarik, though Kraus alleges having a "contractual relationship[,]" and Magarik pleaded the existence of his contract with Kraus in the Nassau County Action, Kraus' complaint is devoid of any details of the formation or terms of the alleged contract, which is fatal. Docs. 1, ¶ 156(a); 146, 29-30, 35; Pet., ¶¶ 14-17, 90-95.  In *Berman v. Sugo LLC*, 580 F. Supp. 2d 191 (S.D.N.Y. 2008), the Court dismissed claims for breach of contract and tortious interference because the complaint alleged the existence of an agreement but did not "set forth a single fact relating to the formation of the contract, the date it took place, the contract's major terms, the parties to the contract, or [defendant's] assent to its terms."  *Id.* at 202-03.

As to Racinos, the complaint is similarly deficient.  Docs. 1, ¶ 156(b); 146, 29-30. Because there are no details regarding the existence of or terms of his contract with Kraus, this claim similarly must fail.  *Berman*, 580 F. Supp. 2d at 202-03.[19]

Accordingly, Defendants' motion for judgment on the pleadings on Count X is granted with respect to Defendants Vigo and Valdberg.[20]

### J.    Vigo's Alleged Unfair Competition (Count XI)

Courts have described unfair competition is a "'broad and flexible doctrine' . . . encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a competitor, and misappropriating for the commercial advantage of one person a benefit or property

---

[19] Defendants' other argument for dismissal, that Vigo and Valdberg cannot be liable for tortious interference because they have not acted unlawfully, is less convincing.  Doc. 161, 37.  Under New York law, "where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior."  *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189-90 (N.Y. 2004) (quoting *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp.*, 87 N.Y.2d 614, 621 (N.Y. 1996)); Doc. 146, 30.

[20] Kraus' claim that that Magarik and Vonn tortiously interfered with Challenger's contract remains, as it went unchallenged.

right belonging to another.'" *Big Vision Private Ltd. v. E.I. du Pont de Nemours and Co.*, 610 F. App'x 69, 70 (2d Cir. 2015) (citing *Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982)). Unfair competition is often pleaded alongside misappropriation of trade secrets, but the information misappropriated need not rise to the level of trade secrets. *Berman*, 580 F. Supp. 2d at 209. However, the defendant's actions must involve "'some element of bad faith.'" *Id.* (citing *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F2d. 1037, 1044 (2d Cir. 1980)). The defendant's behavior must also be "'likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 402-03 (S.D.N.Y. 2019) (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2nd Cir. 1995)); *see also Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 42 N.Y.2d 538, 543 (1977) ("a showing of a likelihood of confusion, rather than actual confusion, is all that is required to state a cause of action" of unfair competition) (citation omitted).

Defendants contend both that Kraus has not sufficiently alleged any misappropriation by Vigo, and that this claim is duplicative of Kraus' misappropriation of trade secrets claims. Doc. 161, 41. However, Kraus alleges in detail that Vigo was a rival company that often copied its plumbing designs and that then partnered with Magarik to form Vonn in exchange for Kraus' confidential proprietary information. Docs. 1, ¶¶ 3-9, 58-70, 76; 146, 33-34. Kraus even attaches pictures of Vigo's allegedly infringing designs and an email where Magarik acknowledges Vigo copied Kraus products. Doc. 1-1, 11-18. Kraus also alleges that it had invested significant resources of both time and capital in designing innovative plumbing fixtures. Docs. 1, ¶ 64; 146, 33.

33

A fair inference from these allegations is that Vigo acted in bad faith.  *Bytemark, Inc. v. Xerox*, 342 F. Supp. 3d 496, 507-08 (S.D.N.Y. 2018) (finding allegations that defendant obtained plaintiff's trade secrets "under the guise" of partnering with them when defendant had no intention of following through on the partnership, then cut plaintiff out of a subsequent deal using those trade secrets, sufficiently alleged unfair competition to survive dismissal).  And though Kraus has sufficiently pleaded misappropriation of trade secrets, *see supra* Part III.A, the information Vigo is alleged to have misappropriated does not have to constitute trade secrets to state a cause of action for unfair competition. *Berman*, 580 F. Supp. 2d at 209.[21] As a result, this claim is broader than and not duplicative of Kraus' misappropriation claims.  *Bytemark, Inc.*, 342 F. Supp. 3d at 509.

Therefore, Defendants' motion for judgment on the pleadings on Count XI is denied.

### K.      Magarik's Alleged Common Law Fraud (Count XIII)

Common law fraud requires "a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."  *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 31 N.Y.3d 569, 578-79 (N.Y. 2018) (citation omitted). A misrepresentation or omission is material if there is a substantial likelihood that a reasonable actor would have considered the information in making an investment

---

[21] Defendants also argue that the only plausible claim of unfair competition Kraus made out is that Vigo hired Racinos, but that is not the basis of Kraus' pleading of this claim or its argument in opposition.  Docs. 1, ¶¶ 164-69; 146, 32-35; 161, 41.  Vigo's hiring of Racinos is alleged, instead, as tortious interference. Doc. 1, ¶ 156(b); *see supra* Part III.I.

decision.  *Abbey v. 3F Therapeutics, Inc.*, No. 06-409, 2009 WL 4333819, at *8, 13 (S.D.N.Y. Dec. 2, 2009).

Additionally, under Rule 9(b) of the Federal Rules of Civil Procedure, there is a "higher pleading standard" for pleading fraud with particularity which mandates that the "'complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'"  *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992) (citing *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)).  Rule 9(b) allows, however, that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Knowledge can be strongly inferred from allegations "(1) that the defendant had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *Abbey*, 2009 WL 4333819, at *10 (citation omitted).

Defendants are correct that Kraus has not alleged its fraud claim against Magarik with sufficient particularity under Rule 9(b).  Doc. 161, 30-31.  Though Kraus specifically alleged that Magarik misrepresented the Lighting Opportunity by "downplay[ing] the upside" and withheld the fact that Build.com representative Kearns was available for hire, Kraus does not specify when these events occurred.  Doc. 1, ¶¶ 34-38, 40-44.  Instead, Kraus alleges, in substance, that the misrepresentation occurred between October 2013 and September 2015, and that the omission occurred sometime between "late 2014 or early 2015" and September 2015.  Docs. 1, ¶¶ 29-38, 40-44, 83; 146, 24.

Specifically, according to Kraus, the Lighting Opportunity was presented in an email dated October 14, 2013.  Docs. 1, ¶ 29; 1-1, 4.  Kraus pleads that it continued to consider the Lighting Opportunity "[a]s of March 2014," and implies that it was also considering the NLCO Opportunity at that time, but fails to provide any timeframe during which Magarik advised against either venture—facts surely within Kraus' knowledge. Doc. 1, ¶¶ 31-37.  Given Magarik was an employee until September 2015, his alleged misrepresentations may have occurred at any time from October 14, 2013 until September 2015, a period of almost two years.  Doc. 1, ¶¶ 29, 83.  Even if one can infer Magarik advised Kraus after March 2014, that only narrows the time frame during which he could have made his misrepresentation to well over a year.  Doc. 1, ¶ 31.

With respect to the omission regarding Kearns' availability, Kraus alleges only that Magarik contacted Kearns "around late 2014 or early 2015" about his personal interest in pursuing the Lighting Opportunity.  Doc. 1, ¶ 40.  Kraus makes no representations about when Magarik hired Kearns.  Doc. 1, ¶¶ 43-44.  Because Magarik was fired in September 2015, he could have failed to disclose Kearns' consulting availability at any point between late 2014 and early 2015, itself a vague estimate, and September 2015, a period of approximately a year.  Doc. 1, ¶¶ 40, 83.  Overall, the allegations never narrow the time period during which Magarik's alleged omission or misrepresentation occurred to less than a year.  Similar, and even shorter, lengths of time have been held insufficiently specific under Rule 9(b).  *See, e.g.*, *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 248-50 (S.D.N.Y. 2011) (finding fraud claim inadequately plead where misrepresentations occurred "during 2001"); *Doehla v. Wathne*

36

*Ltd., Inc.*, No. 98-CV-6087, 1999 WL 566311, at *17 (S.D.N.Y. 1999) (dismissing fraud claim where misrepresentations allegedly took place over a four-month period).[22]

Accordingly, Defendants' motion for judgment on the pleadings as to Count XIII is granted.

### L.   Alleged Aiding and Abetting Conspiracy to Commit Common Law Fraud and Other Torts against Vonn, Vigo, and Valdberg (Count XIV)

Because both the aiding and abetting of a fraud, and conspiring to commit a fraud, are predicated upon the existence of the underlying fraud, and Kraus' fraud claim has been dismissed, Defendants' motion on Count XIV is similarly granted.  *Filler v. Hanvit Bank*, No. 01-CV-9510, 2003 WL 22110773, at *3 (S.D.N.Y. Sept. 12, 2003); *Diamond State Inc. v. Worldwide Weather Trading, LLC*, No. 02-CV-2900, 2002 WL 31819217, at *4 (S.D.N.Y. 2002); *see supra* Part III.K.[23]

---

[22] Defendants' other arguments in support of dismissal, that Magarik's advice to forgo the Lighting Opportunity was not a misrepresentation but mere opinion, that his opinion was protected by the business judgment rule, and that Kraus was not justified in relying on his opinion, are less availing.  Docs. 151, 14-15; 161, 31-32.  The complaint provides strong indication that Magarik's advice was not his opinion on the value of the lighting deals at all.  Docs. 1, ¶¶ 29-55; 1-1, 4; 146, 25-26.  *Abbey*, 2009 WL 4333819, at *9 (noting opinion statements may be actionable if the speaker does not reasonably believe them).  Moreover, "[i]t is black-letter, settled law that when a corporate director or officer has an interest in a decision, the business judgment rule does not apply.'"  *In re Croton River Club, Inc.*, 52 F.3d 41, 44 (2d Cir. 1995).  Here, Kraus clearly pleads that Magarik had an interest in Kraus not pursuing the Lighting Opportunity:  to take advantage of it himself using Vonn.  Doc. 1, ¶ 51.  In addition, Magarik's misrepresentation was material, as evidenced by the fact that Kraus put off entry into the lighting space following Magarik's advice.  Docs. 1, ¶ 34; 146, 25; 161, 32.  Kraus also plausibly alleges its reliance on Magarik's advice given his longstanding relationship with Kraus as a founding member.  Docs. 1, ¶ 22; 146, 26.  And, in any event, the reasonableness of reliance on a misrepresentation is "intensely fact specific" and "generally considered inappropriate for determination on a motion to dismiss."  *Abbey*, 2009 WL 4333819, at *12 (citation omitted).

[23] Dismissal would not be warranted, however, based on Defendants' argument that Kraus failed to allege what each of Vigo, Valdberg, and Vonn, did to aid and abet and conspire to commit the fraud.  Doc. 161, 33-35.  Kraus specifically alleges that Vigo and Valdberg invested in Vonn, knowing that Magarik was using Vonn to divert the Lighting Opportunity, that Vonn hired Challenger after he collected documents for Vigo and Valdberg about Kraus' business, and that Vigo hired Racinos and tried to entice other Kraus employees to join Vigo.  Docs. 1, ¶¶ 3-9, 58-62, 67-70, 80, 85-89, 96-100; 1-1, 20-22, 34-36; 146, 27-28.

### M.      Breach of Contract (Counts XII and XVI)

Under New York law, pleading a breach of contract claim requires alleging "'the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contract obligations, and damages resulting from the breach.'"  *Innovative Biodefense, Inc. v. VSP Techs., Inc.*, 176 F. Supp. 3d 305, 317 (S.D.N.Y. 2016) (citing *LaRoss Partners, LLC v. Contact 911 Inc.,* No. 11-CV-1980, 2015 WL 2452616, at *6 (E.D.N.Y. May 21, 2015)).

#### i.      Magarik

Defendants' sole argument for dismissal with respect to the breach of contract claim against Magarik is that there is no allegation of a valid contract between Magarik and Kraus.  Doc. 161, 42.  Because the Court has determined that a contract is not sufficiently alleged, *see supra* Part III.I, Defendants' motion for judgment on the pleadings as to Count XII is granted.

#### ii.      Challenger

Defendants contend that there are no factual details alleged sufficient to show that Challenger breached his confidentiality agreement with Kraus.  Doc. 161, 42.  To the contrary, Kraus alleges that, mere days before resigning to work at Vonn, Challenger downloaded proprietary information to share with Vigo, Valdberg, and Vonn, and that he continued to solicit Kraus employees for further proprietary information after his departure.  Docs. 1, ¶¶ 7-8, 89-100; 146, 35-36.  Kraus specifically pleads that this behavior violated the confidentiality agreement provisions against (1) disclosing proprietary information and (2) soliciting Kraus employees upon termination, attaches

those provisions, and appends the messages Challenger sent to a Kraus employee to obtain information generated while at Kraus.  Docs. 1, ¶¶ 91-94; 1-1, 24-36.

As a result, Defendants' motion for judgment on the pleadings is denied with respect to Count XVI.[24]

### N.    Alleged Unfair and Deceptive Trade Practices Against All Defendants Except Vonn (Count XVIII)

A claim under § 349 of New York's General Business Law requires allegations that "a defendant has engaged in (1) consumer-oriented conduct, that is (2) materially misleading, and that (3) the plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Plavin v. Group Health Inc.*, --- N.E.3d ---, 2020 WL 1355864, at *4 (N.Y. Mar. 24, 2020).  Although claims under § 349 are generally raised by consumers, a corporate competitor may sue under the statute so long as there is "'some harm to the public at large.'"  *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003) (citing *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)).  To that end, a corporate plaintiff must allege the defendant "harmed the consumer or the public interest in a material respect."  *BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*, 408 F. Supp. 3d 508, 523 (S.D.N.Y. Sept. 30, 2019) (citations omitted).  In particular, trademark violations are not generally cognizable under § 349 unless "there is a specific and substantial injury to the public interest over and above ordinary trademark infringement or dilution."  *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 435

---

[24] Defendants' secondary argument for dismissal, made several times throughout their papers, that Vonn does not compete with Kraus, is similarly unpersuasive.  Docs. 151, 11, 13; 161, 15, 18, 20, 24, 27-28, 32, 40, 42.  Though Vonn is a lighting company and Kraus is not, the crux of Kraus' complaint is that Magarik created Vonn to pursue a Lighting Opportunity meant for Kraus, and that the pursuit was made easier by the information Magarik was able to use at Vonn and provide his investors, who happened to be Kraus competitors.  Doc. 1, ¶¶ 51, 58, 67-68, 73-76.  That Kraus and Vonn do not compete in the lighting business today is thus inconsequential, except to the extent that it supports Kraus' claim that Magarik misled Kraus to forgo the Lighting Opportunity for his own benefit.  Doc. 1, ¶¶ 34-38.

(S.D.N.Y. 2012).  Thus, to properly state a claim under § 349, Kraus "must allege

conduct that has 'significant ramifications for the public at large.'"  *RCA Trademark*

*Mgmt S.A.S. v. VOXX Int'l Corp.*, No. 16-CV-6294, 2015 WL 5008762, at *4 (S.D.N.Y.

Aug. 24, 2015) (citing *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269,

273 (S.D.N.Y. 2003)).  Significant ramifications are "potential danger to the public health

or safety."  *RCA Trademark Mgmt S.A.S.*, 2015 WL 5008762, at *4 & n.5 (citing, *inter*

*alia*, *DePinto v. Ashley Scott, Inc.*, 222 A.D.2d 288, 289 (1st Dep't 1995)).

Defendants argue that Kraus has failed to sufficiently allege that Vigo, Valdberg,

Magarik and Challenger engaged in deceptive, consumer-oriented behavior that affected

the consumer-at-large.  Doc. 161, 39-40.  Though Kraus sufficiently alleged deception in

that Vigo and Valdberg copied its products, Magarik and Challenger provided them with

the means to do so, and they sold products substantially similar to Kraus', Kraus

admittedly has not alleged any harm to consumers beyond confusion.  Docs. 1, ¶¶ 3, 6-7,

58-70, 96-100, 196-201; 1-1, 11-18; 146, 32.  Because consumer confusion is a harm that

may be addressed by trademark laws, and because Kraus has not raised any allegation

implicating the health or safety of the consumer, Kraus' claim under § 349 must fail.

*BBK Tobacco & Foods, LLP*, 408 F. Supp. 3d at 529-30 (citing *Coach*, 908 F. Supp. 2d

at 435-36); *see also Rosenshine v. A. Meshi Cosmetics Indus. Ltd.*, No. 18-CV-3572,

2020 WL 1914648, at * 10-11 (E.D.N.Y. Mar. 30, 2020).[25]

---

[25] The authority Kraus relied on to the contrary, *Mayes v. Summit Entm't Corp.*, No. 16-CV-6533, 2018 WL
566314, at *7 (E.D.N.Y. Jan. 18, 2018), was a report and recommendation that was subsequently rejected
on this very issue.  *Mayes v. Summit Entm't Corp.*, 287 F. Supp. 3d 200, 211 (E.D.N.Y. 2018) ("In sum,
Plaintiffs have failed to allege a consumer-oriented harm greater than consumer confusion, a harm which is
insufficient to support a claim under Section 349."); Doc. 146, 32.

Accordingly, Defendants' motion for judgment on the pleadings as to Count XVIII is granted.[26]

### O.   Valdberg

Defendants argue that, because Valdberg is not subject to any cause of action as an individual independent of his company Vigo, that the complaint against Valdberg should be dismissed.  Doc. 161, 43.  Defendants, however, make this claim without citing any authority, and by discounting the several instances where Kraus made specific allegations as to Valdberg.  Doc. 146, 37-38.  Those instances include that Valdberg invested in Vonn in exchange for information about Kraus' business, and that Valdberg knew that Magarik was using Vonn to take advantage of the Lighting Opportunity.  Doc. 1, ¶¶ 58-70.  Accordingly, judgment on the pleadings will not be rendered as to Valdberg.

### P.   Leave to Amend

Kraus is granted leave to amend the claims dismissed on Rule 9(b) grounds, common law fraud and aiding and abetting conspiracy to commit fraud, Counts XIII and XIV, respectively.  *Anhui Konka Green Lighting Co., Ltd. v. Green Logic LED Elec. Supply, Inc.*, No. 18-CV-12255, 2019 WL 6498094, at *12 (S.D.N.Y. Dec. 3, 2019) ("Leave to amend should be freely granted, especially where dismissal of the complaint was based on Rule 9(b).") (collecting cases).  Kraus is also granted leave to amend its CFAA claim, Count II, its tortious interference claims against Vigo and Valdberg, Count X, and its breach of contract claim against Magarik, Count XII.

---

[26] Defendants' other arguments to dismiss this claim are less persuasive.  Doc. 161, 39-40.  Construed with every inference in Kraus' favor, Kraus plausibly pleaded that the alleged deceptions occurred in New York. Docs. 1, ¶¶ 18-19; 146, 32 n.13; N.Y. Gen. Bus. Law § 349(a).  Defendants also cite no authority that the Court must dismiss where Kraus has failed to identify any registered intellectual property that Vigo copied, or supporting the proposition that Magarik and Challenger never having worked for Vigo precludes Kraus' claim, especially where they are alleged to have shared Kraus' proprietary information with Vigo.  Docs. 1, ¶¶ 2-9, 58-70, 76, 89-100; 161, 39-40.

However, Kraus' claim for unfair and deceptive trade practices, Count XVIII, would not succeed even if replead because Kraus cannot claim any risk to the public from Vigo's actions, even if its allegations are taken as true.  *See supra* Part III.N.  Thus, leave to amend would be futile and is denied with respect to Count XVIII.  *Henneberry*, 415 F. Supp. 2d at 433.

## IV.   Conclusion

In sum, Defendants' motion for judgment on the pleadings is GRANTED with respect to Counts II, XII, XIII, XIV, and XVIII as to all Defendants, GRANTED with respect to Count X as to Defendants Vigo and Valdberg, and DENIED with respect to all remaining counts and as to all remaining Defendants.

Plaintiff's motion to amend is GRANTED with respect to Counts II, X, XII, XIII, and XIV and DENIED with respect to Count XVIII.  The parties are directed to appear for a status conference on May 22, 2020 at 10:15 AM.

The Court respectfully directs the Clerk to terminate this motion, Doc. 160.
SO ORDERED.


Dated:     May 12, 2020
           New York, New York

_____
Edgardo Ramos, U.S.D.J.